**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x

In re:                                                      Chapter 11

NORTHWEST AIRLINES CORPORATION, *et al.*,        Case No. 05-17930 (ALG)

                                       Debtors.        Jointly Administered

--------------------------------------------------------------x

CAPP SEVILLE, INC.,


                                       Plaintiff,


              -against-                                      Adv. No. 06-01446 (ALG)

NORTHWEST AIRLINES, INC.,


                                       Defendant.
--------------------------------------------------------------x
NORTHWEST AIRLINES, INC.,


                                Third Party Plaintiff,


              -against-


LARKEN, INC.,


                                Third Party Defendant.
--------------------------------------------------------------x

<u>**MEMORANDUM OF OPINION**</u>

A P P E A R A N C E S:

FOLEY & LARDNER
Counsel for Plaintiff and Counterclaim-Defendant, Capp Seville, Inc.
   By:  David B. Goroff, Esq.
        Derek L. Wright, Esq.
321 N. Clark Street, Suite 2800
Chicago, Illinois 60610

   By:  Todd C. Norbitz, Esq.
        Dana  C. Rundolf, Esq.
90 Park Avenue, 37th Floor
New York, New York 10016-1314

YOST & BAILL
Counsel for Plaintiff and Counterclaim-Defendant, Capp Seville, Inc.
  By:   Daniel W. Boerigter, Esq.
220 South Sixth Street, Suite 2050
Minneapolis, Minnesota 55402

LEONARD STREET AND DEINARD
Counsel for Defendant and Counterclaimant, Northwest Airlines, Inc.
  By:   Jeffrey A. Eyres, Esq.
        Brian W. Thomson, Esq.
150 South 5th Street, Suite 2300
Minneapolis, Minnesota 55402

CADWALADER, WICKERSHAM & TAFT LLP
Counsel for Defendant and Counterclaimant, Northwest Airlines, Inc.
  By:   Bruce R. Zirinsky, Esq.
        Gregory M. Petrick, Esq.
        J. David Leamon, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for summary judgment filed by the

defendant/counterclaimant, Northwest Airlines, Inc. ("Northwest"), and the

plaintiff/counterclaim-defendant, Capp Seville, Inc. ("Capp"), in a dispute relating to

service contracts for the occupancy of hotel rooms.  Northwest has moved for summary

judgment on the issue whether Capp, the hotel owner, breached the contracts, which were

executed by Northwest and a hotel manager, Larken, Inc. ("Larken").[1]  Capp opposes

Northwest's motion and has moved for summary judgment on the breach of contract

allegations and also on Northwest's allegation of tortious interference with contract.  For

the reasons set forth below, the summary judgment motion of Northwest on the issue of

Capp's liability for breach of contract is denied.  Capp's motion for summary judgment is

granted.

---

[1] Larken is a third-party defendant in this action.

# I. BACKGROUND

While the parties disagree on many of the facts, the facts necessary to decide these motions are not in material dispute.

<u>Management Agreement</u>

Capp was, prior to the initiation of this lawsuit, the owner of the "real property together with a 16-story hotel improvement located in Bloomington, Minnesota" (the "Hotel").  (Capp Resp. to NWA Facts  p. 1.)  In 1987, Capp and Larken entered into a Hotel Management Agreement, which was subsequently superceded by a Restated Hotel Management Agreement, dated December 2, 1988 (the "Management Agreement").  Pursuant to the terms of the Management Agreement, Larken was engaged

> as the sole and exclusive managing agent for the Hotel, authorized to supervise and direct the management and operation of the Hotel on the terms of this Agreement and for the consideration provided in this Agreement.

(Mgmt. Agmt., ¶ 2.)  The Management Agreement designated Capp as "Owner" and Larken as "Manager."[2]  The Management Agreement provided:

> Manager agrees to operate the Property as a hotel, and to pay all expenses and obligations associated therewith  .  .  .  under the terms of this Agreement, in full compliance with the standards and requirements of the Best Western Agreement, which operation includes without limitation the rental of rooms and operation of the kitchen and bar facilities, operation of cocktail lounge, lobby and dining areas, leasing of retail and office space, and for all activities in connection therewith which are customary and usual to such operation.

(Management Agreement, § 5(a)).  Larken collected the revenues of the Hotel with a percentage of monthly rents paid over to Capp.

---

[2] Capp and Larken subsequently entered into a series of amendments that modified or extended the Management Agreement.  The parties agree that these amendments do not impact the key terms of the Management Agreement on which they rely.

The Management Agreement also contained certain restrictions, one of which was that

> In entering into service, maintenance and other contracts and into leases in replacement of or in addition to the Contracts and Leases, Manager agrees that (i) no such contracts and leases shall extend beyond the Term of this Agreement unless they are terminable at the end of the Term, (ii) all such contracts and leases shall be in Manager's name and shall not impose liability on Owner unless assumed by Owner . . . .

(Management Agreement, § 5(e).)[3]  The Management Agreement originally had a term of ten years, but was subsequently extended through December 31, 2007.

Hotel Service Agreements

During the summer of 2004, Northwest sent out a request for contract proposals for the provision of hotel rooms for Northwest employees.  (NWA SMF p. 4.)  Larken responded to the request on behalf of the Hotel.  Northwest and Larken began negotiations and subsequently agreed on terms for two Hotel Service Agreements (the "HSAs").[4]  Natalie Goldston, Larken's general manager for the Hotel, negotiated with Northwest on the terms of the HSAs.

The HSAs provided Northwest with a contractual right to occupy rooms in the Hotel at preferential rates.  The HSAs are each for a five-year term, from 2004 to August 20, 2009.  Both set a fixed price per room for each year of the contract.   The HSAs provided that

> This Agreement is entered into . . . between Northwest Airlines, Inc. ("Northwest") and the Clarion Hotel ("Hotel") on behalf of, and as

---

[3]  The terms "Contracts and Leases," as used in this paragraph, are defined terms meaning "the service contracts and space leases in effect as of the date hereof and described on Exhibit B attached hereto and the Best Western Agreement."  (Management Agreement, § 5(e)).  Exhibit B does not include the contracts with Northwest, described below, that are at issue in this lawsuit.

[4]  The first HSA, Contract No. BH 663312, is dated August 21, 2004 and provides up to 150 rooms per night.  The second Hotel Services Agreement, Contract No. BH 663318, is dated September 1, 2004 and provides up to 20 rooms per night.  For purposes of this dispute both agreements contain largely the same provisions and the parties treat them as essentially identical for purposes of the motions.

authorized agent for, the Hotels listed on Appendix A[5] for the purposes of
setting forth the terms and conditions for the accommodation of Northwest
flight crews and other employees and contractors ("Northwest Guests").

The HSAs did not provide for termination of the agreement by the Hotel prior to
expiration, absent default by Northwest.  (NWA S.J. Memo. p. 8.)  It is not contested that
the parties performed under the terms of the HSAs for nearly two years. (NWA
Undisputed Facts p. 5.)

It is also undisputed that the HSAs were executed on a Northwest template form
that was created by Northwest corporate personnel and in-house legal counsel, and that
the template has been utilized by Northwest in many similar hotel service agreement
transactions. (Capp SMF p. 3.)  Three separate signature blocks appear on the HSAs; one
for signature by Northwest, another for the Hotel and the third labeled "Acknowledged
and Consented To" with a space for the hotel "Owner" to sign.  The executed HSAs
contain only the signatures of Northwest and the Hotel, the latter having been signed by
an employee of Larken as "Director of Operations" for the "Clarion Hotel."  It is not
disputed that the separate signature block labeled "Hotel Owner" remains blank and
unsigned, and that Capp, as the hotel owner, never signed either of the HSAs.[6]

---

[5] Appendix A states "[t]he following hotel property shall be considered included in the definition
of Hotel as used in this Agreement and subject to the terms and conditions set forth below . . . ."
The Clarion Hotel is named.  The appendix then goes on to list the name and address of the Hotel,
the contract room rate terms and the tax rates, the billing address for Northwest and certain
additional services to be provided to Northwest employees in connection with the HSAs.

[6] The parties are in dispute regarding certain statements that were allegedly made by Larken to
Northwest during this time period.  For example, it is the deposition testimony of Ms. Goldston of
Larken that she advised Jim Hass, Staff Manager for Northwest, that the agreement between
Larken and Capp expired in December 2007.  (Capp SMF ¶¶ 114-115.)  Brad Cook, the Director
of Operations for Larken, also recalled telling someone from Northwest "that we have to talk to
the Capps.  Somebody would have to talk to the Capps.  We'd also have to talk to Larry [Cahill,
the President of Larken] because it was going to exceed the length of this agreement that Larken
had with the Capps."  (Capp SMF ¶ 106.)  Furthermore, Cook of Larken recalls a call during
which there was "talk that Larken was leasing the hotel from Capp Seville, and that we – if it was
going to extend beyond the two year agreement, there had to be a signature from somebody
because we didn't have authorization to do that."  (Capp SMF ¶ 107.)  Ms. Goldston further says
she brought it to the attention of Loren Kix, the Northwest Commodity Manager for Hotels, that
the Hotel owner had not signed and inquired if he wanted her to give Capp a copy of the contract

In connection with subsequent negotiations between Capp and Larken in the fall of 2004, Capp apparently requested a copy of the HSAs. (NWA Reply Facts p. 75.)  The parties dispute when Capp first became aware of the existence of the HSAs or actually received a copy from Larken.  Capp claims that it learned for the first time in February 2005 that the HSAs extended until August 21, 2009, almost two years longer than the expiration date of the Management Agreement. (NWA Reply Facts p. 79.)  After Capp first saw the HSAs, Capp claims, Lisa Capp told Goldston of Larken that the term of the HSAs violated the Management Agreement and Goldston promised her this would be rectified. (Capp Reply p. 13.)  Capp asserts that on April 5, 2005, it advised Larken formally that the HSAs had exceeded Larken's authority and that Larken should inform Northwest that Capp refused to be bound by the HSAs and that it did not agree that the HSAs would run with the land.

It appears that Larken and Northwest continued to perform under the HSAs for some time, even after Northwest filed for bankruptcy on September 14, 2005.  It further appears that Larken fell behind on its obligations to Capp and may have breached the Management Agreement.  Capp alleges that Larken failed to timely pay rent owed to Capp and failed to pay required real estate taxes. Capp also claims that Larken's entry into the HSAs was a breach of the Management Agreement.  Whether or not there was a breach, Capp determined to sell the Hotel and, in connection therewith, disavowed any rights of Northwest for preferential rates for its employees.

---

to sign, to which Mr. Kix responded that it was unnecessary.  (Capp SMF ¶ 147).  The Northwest representatives did not recall these conversations, they are disputed for purposes of this motion, and the Court has not relied on them in this opinion.  However, it is not disputed that the parties were aware that the owner's signature had not been obtained and that they went forward with the transaction in any event.  Moreover, Northwest does not claim that Larken's representatives affirmatively represented that Capp had approved or that Capp's signature was unnecessary.

Termination of the HSAs

On November 7, 2005, Capp signed a listing agreement with CB Richard Ellis ("CBRE"), to sell the Hotel. (Capp responses to NW undisputed facts, p. 7). Capp eventually negotiated with La Quinta Acquisition Properties ("La Quinta") with the mutual understanding that Larken's services would be discontinued and that La Quinta would assume management responsibilities. (NW Reply Facts p. 85.) During the course of those negotiations, La Quinta learned of the HSAs. (NWA SMF p. 5.) On March 15, 2006, Capp and La Quinta executed a purchase agreement for the Hotel. On March 30, 2006, CBRE sent La Quinta an email stating that "[w]e told Larken yesterday that they needed to get rid of NW Airlines." (NWA SMF, p. 5.) On March 31, 2006, Larken sent Northwest, copy to Capp, a letter stating as follows:

> It is with deep regret that Larken, Inc. (Larken) is compelled to notify you that we must cancel the Contracts referenced above. The cancellation shall be effective in accordance with our understanding of the prospective events further discussed herein and in no event shall the Contracts continue beyond any sale date of the Hotel.

The basis given for the cancellation was that "Due to the financial stress, Larken and Capp agreed that the best result could only come from a sale of the Hotel. It now appears that such a sale is eminent [sic]. It is our understanding that the prospective buyer will not assume the Contracts." (Eyres Decl., Exh. T.) On April 7, 2006, Capp's attorney sent a letter to Larken confirming that, in connection with Capp's sale of the Hotel, it was terminating the Management Agreement. The letter stated, "Capp previously provided a list of contracts for which the buyer is willing to assume the responsibility after the closing. It is Larken's responsibility to terminate all other contracts. In particular, and as discussed this morning, Larken is solely responsible under its agreements with Northwest Airlines." (Eyres Decl. Exh. U.) The letter went on:

> Finally, please note that neither Capp nor the buyer are assuming any responsibility for actions or claims relating to Larken's operation of the Hotel prior to the closing, Larken's employees, including terminating the same, or any Larken contracts or agreements, including any claims related to Larken's termination or breach of agreements, that the Buyer does not want to assume. Specifically, and without limiting the generality of the foregoing, Capp is not assuming any responsibility under any agreement between Northwest Airlines and Larken. As Capp previously informed you on April 6, 2006, Capp has not ever agreed to, nor is it bound by, the terms of the Hotel Services Agreements with Northwest Airlines. The buyer has expressed some willingness to have direct discussions with Northwest Airlines about post closing reservations, but as mentioned above, does not want to assume the contracts on the terms Larken agreed to.

Larken signed the letter "agreed and accepted." (Eyres Decl. Exh. U.)

Capp contends the sale of the hotel was motivated by Larken's continued breach of the Management Agreement and its financial instability but maintains it did not instruct Larken to terminate the HSAs. (NW Reply Facts p. 87.) Northwest asserts that it was La Quinta's demand, as a condition to purchasing the hotel, that Capp terminate the HSAs.

Eventually Northwest took the position that Capp and Larken were both bound by the terms of the HSAs. After being informed that the HSAs would be terminated, Northwest threatened to bring suit against La Quinta and Capp. La Quinta then indicated that it was not willing to close on the purchase of the Hotel under threat of litigation. In response, Capp filed the current adversary proceeding and sought a preliminary injunction along with declaratory and other relief. Prior to the hearing on the preliminary injunction, an agreement was reached between Northwest and Capp under which Northwest withdrew its objection to the sale and dropped all claims against La Quinta on condition that Capp deposit $3,916,741.99 in escrow pending the outcome of this case. This amount presumably represents the ceiling on Northwest's damages claim against Capp. The sale to La Quinta subsequently closed on June 7, 2006.

Capp's complaint, filed in this Court, seeks: (i) a declaratory judgment that it has no obligation under the HSAs and that Northwest cannot enforce the HSAs against Capp or its successors; (ii) injunctive relief, including a temporary restraining order and preliminary injunction against Northwest to enjoin its attempts to enforce the HSAs against Capp or its successors; and (iii) damages against Northwest, including punitive damages, for purported tortious interference with prospective contract and economic advantage. In its amended counterclaims, dated July 9, 2007, Northwest asserts the following claims against Capp: (i) damages resulting from breach of contract as a result of Capp's alleged termination of the HSAs; and (ii) damages resulting from tortious interference with contract as a result of Capp and CBRE's alleged instruction to Larken to terminate the HSAs. Northwest has also filed a third-party claim against Larken.

Both Northwest and Capp have moved for summary judgment in its favor on the issue of Capp's liability for breach of contract in connection with the HSAs. Additionally, Capp moves for summary judgment on the issue of Capp's liability for tortious interference with contract.

## II. DISCUSSION

In accordance with Bankruptcy Rule 7056, which incorporates Fed.R.Civ.P. 56, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in

the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Ames Dep't Stores, Inc.*, 161 B.R. 87, 89 (Bankr. S.D.N.Y. 1993). A fact is considered material if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248. "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The fact that both parties have moved for summary judgment does not establish that there are no material facts in dispute. *See Morales v. Qintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001); *MG Ref. & Mktg., Inc. v. Knight Enters, Inc.,* 25 F. Supp. 2d 175, 180 (S.D.N.Y. 1998).

A. Northwest Summary Judgment Motion

In its summary judgment motion, Northwest relies exclusively on the principle of actual authority and the proposition that the relationship between Capp and Larken created by the Management Agreement gave Larken authority to bind Capp.[7]

Under the law of Minnesota, which both parties agree governs this dispute,[8] "agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *A. Gay Jenson Farms, Co. v. Cargill*, 309 N.W.2d 285, 290 (Minn. 1981), citing *Jurek v. Thompson*, 208 Minn. 191, 197, 241 N.W.2d 788, 791 (Minn. 1976). "[A]n agent must have authority to bind the principal when acting on the principal's behalf." *Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.*, 413 F. Supp. 2d 1016, 1025 (D. Minn. 2006). "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably

---

[7] Northwest dropped its reliance on apparent authority for purposes of its summary judgment motion. *See* Hr'g Tr. 39:15-20, October 30, 2007.

[8] Both the Management Agreement and the HSAs provide that the law of Minnesota is the governing law. *See* Mgmt. Agmt ¶ 20; HSAs ¶ 14.

10

believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  Restatement (Third) of Agency § 2.01 (2006).  "In the absence of any persuasive evidence of manifestation of consent, right of control, and fiduciary relationship, there is no agency as a matter of law."  *Jurek*, 208 Minn. at 200-01, 241 N.W.2d at 793.

As evidence of Larken's actual authority to commit and bind Capp to the terms of the HSAs, Northwest relies on the Management Agreement between Capp and Larken.[9] For the proposition that the Management Agreement gave Larken actual authority to bind Capp, Northwest points to the contractual provisions that appoint Larken as manager of the Hotel and give Larken the right to rent hotel rooms.  Section 2 of the Management Agreement provides, in relevant part:

> Owner, having full right and power to enter into this Agreement for the full term and upon all conditions herein contained, hereby engages Manager as the *sole and exclusive managing agent* for the Hotel, authorized to supervise and direct the management and operation of the Hotel on the terms of this Agreement . . . (emphasis added).

Additionally, § 5(a) of the Management Agreement provides, in part, that:

> Manager agrees to operate the Property as a hotel, and to pay all expenses and obligations associated therewith . . . under the terms of this Agreement, in full compliance with the standards and requirements of the Best Western Agreement, *which operation includes without limitation the rental of rooms* and operation of the kitchen and bar facilities, operation of cocktail lounge, lobby and dining areas, leasing of retail and office space, and for all activities in connection therewith which are customary and usual to such operation. (emphasis added).

---

[9] It is acknowledged that Northwest never saw the Management Agreement before signing the HSAs (NWA Resp. to Capp SMF, p. 52), but there is no dispute that knowledge or reliance is not a requirement for proof that an agent has actual authority.  "[A]n undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority."  *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 331 (Minn. 2004), quoting Restatement (Second) of Agency § 186 (1958).

Based upon these provisions, Northwest argues that Larken was the managing agent of Capp and had the authority to rent hotel rooms, and Larken therefore had the authority to enter into the HSAs on behalf of Capp.

In response, Capp points to § 5(e) of the Management Agreement, which provides:

> In entering into service, maintenance and other contracts and into leases in replacement of or in addition to the Contracts and Leases,[10] Manager agrees that (i) no such contracts and leases shall extend beyond the Term of this Agreement unless they are terminable at the end of the Term, (ii) all such contracts and leases shall be in Manager's name and shall not impose liability on Owner unless assumed by Owner . . ."

Capp argues that this language prevented Larken from imposing liability on Capp under the HSAs without Capp's consent, and that Larken could not commit to any contract that extended beyond the term of the Management Agreement, which was December 31, 2007. The HSAs expired on August 20, 2009.

In determining Larken's actual authority to enter into the HSAs, the language of the Management Agreement is clear. Even if the Management Agreement permitted Larken to act as Capp's agent under certain circumstances, it expressly denied Larken the authority to enter into a contract with the terms contained in the HSAs. It does not follow that the right to engage in "rental of rooms" in a hotel necessarily encompasses long-term agreements that commit a party to make large blocks of hotel rooms available for five years at highly preferential rates and terms. In any event, Larken lacked the actual authority under the Management Agreement to bind Capp to the terms of the HSAs. The HSAs extended beyond the term of the Management Agreement and were not terminable at the end of its term. As noted above, "an agent must have authority to bind the principal when acting on the principal's behalf." *Cardiac Pacemakers, Inc.*, 413 F. Supp.

---

[10] *See supra*, n. 3.

2d at 1025.  Larken did not have that authority.  It also did not have actual authority to "impose liability on Owner."  (Mgmt. Agmt.  § 5(e)(ii).)

Northwest cites several cases that hold that a managing agent "normally has the widest authority of all business agents, and unless limited by instructions, is in complete control of its operations." *Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1531 (Cal. App. 1st Dist. 1991); *see also Derrick v. the Drolson Co.*, 69 N.W.2d 124, 128 (Minn. 1955); *Government Guar. Fund of the Republic of Fin. v. Hyatt Corp.*, 95 F.3d 291, 307 (3d Cir. 1996); *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Ltd.*, 19 Cal. App. 4th 615, 619 (Cal. App. 4th Dist. 1993).  (NWA S.J. Memo. p. 10.)  The one Minnesota case, *Derrick v. Drolson Co.*, while containing a brief discussion of agency principles, relates mainly to the issue whether an individual was a "managing agent" for purposes of service of process.  The remaining cases, not from Minnesota, involve situations where a hotel owner sought to terminate a management agreement with its agent and are not on point.  Furthermore, even assuming Larken was granted wide authority as a "managing agent" under § 2 of the Management Agreement, that provision also specifically states that Larken is "authorized to supervise and direct the management and operation of the Hotel *on the terms of this Agreement . . .*"  (emphasis added)  As discussed above, Larken's entry into the HSAs violated the restrictions set out in § 5(e) of the Management Agreement.

Northwest argues that the limitations in § 5(e) of the Management Agreement apply only to vendor and service contracts and leases, and that to interpret them as applying to the leasing of hotel rooms would deprive Larken of its agency authority altogether, and would be in direct conflict with the language of § 5(a), which permits

Larken "to rent rooms without limitation." This overstates the import of the language in

§ 5(a), which states that Larken is to operate the property as a hotel,

> which operation includes without limitation the rental of rooms and
> operation of the kitchen and bar facilities, operation of cocktail lounge,
> lobby and dining areas, leasing of retail and office space, and for all
> activities in connection therewith which are customary and usual to such
> operation.

Northwest's contention that this language means that Larken had the ability to rent rooms

"without any limitations" or restrictions placed upon its ability to do so is clearly wrong.

The phrase "includes without limitation" is a standard drafting term indicating that the

operations that Larken may perform are not limited to those articulated in the paragraph.

Nor does Northwest have any better support for the contention that the restrictions

in § 5(e) must be read as applying only to vendor and service contracts and leases. As

noted above, in § 5(e), the phrase "Contracts and Leases" is defined as "the service

contracts and space leases in effect as of the date hereof and described on Exhibit B

attached hereto and the Best Western Agreement." Yet § 5(e) itself is broader – it

specifically limits the powers of Larken "[i]n entering into service, maintenance *and

other contracts* and into leases in replacement of *or in addition to* the Contracts and

Leases . . ." (emphasis added).

The above interpretation does not frustrate the purpose of the Management

Agreement and the ability of Larken to exercise its authority thereunder, or conflict with

the terms of the Agreement, or lead to a harsh or absurd result, as Northwest also

contends. It simply means that Larken cannot bind Capp to certain types of contracts

without Capp's consent, including contracts that extend beyond the period of Larken's

operation of the Hotel. It is understood that under Minnesota law the courts "read

contract terms in the context of the entire contract and will not construe the terms so as to

lead to a harsh and absurd result" and that they "interpret a contract in such a way as to give meaning to all of its provisions." *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). While the intent of the Management Agreement was to vest the management of the Hotel in Larken (and this does include renting rooms), this goal could obviously be accomplished without giving Larken license to enter into agreements completely unrestricted by the other terms of the Management Agreement. Nor does this amount to "frustration of the dominant purpose of the contract." *Egner v. States Realty Co.*, 223 Minn. 305, 314, 26 N.W.2d 464, 470 (Minn. 1947).

The record contains several other undisputed facts that conflict with Northwest's position. Northwest drafted the template that was used for the HSAs. The preamble of the HSAs states that the Hotel is acting "on behalf of, and as authorized agent for, the Hotels listed on Appendix A . . . ." Appendix A lists only the Clarion Hotel. The template uses the term "Hotel" distinctly from the term Hotel "owner". For example, § 12 of the HSAs provides:

> The parties (and the Hotel owner, if the Hotel owner is not a party hereto) expressly agree that this Agreement shall run with the land. This Agreement shall be binding on all successors and assigns of the parties (and the Hotel owner, if the Hotel owner is not a party hereto) whether or not such successor or assign acquires by contract, merger, purchase of assets or operation of law.

Furthermore, Paragraph 12 goes on to state:

> Hotel owner shall provide written notice to Northwest and Hotel not later than ten (10) days after it has agreed in writing to sell, convey, transfer or assign any interest in the Hotel facility or this Agreement.

Whether or not this provision was enforceable in the absence of the "owner" as a party, it is clear that the HSAs contemplated the Hotel owner as a separate entity from the Hotel. Larken signed as "the Clarion Hotel," and not for Capp as the Hotel owner.

That brings us to the principle that a party dealing with an agent cannot proceed in reliance on actual authority if it becomes aware of restrictions on that agent's authority.

Under Minnesota law,

> the law does not bind a principal 'by an act of the agent in excess of his actual authority' in favor of one dealing with an agent and having knowledge of the extent of his authority.  Instructions modifying or limiting the authority of the agent and known to such a person are as binding upon him as they are upon the agent.  He can acquire no rights against the principal by dealing with the agent contrary thereto.  So no third person, to say nothing of another representative of the same principal, can base any right upon the act of an agent in known disobedience of the expressed orders of his principal.

*Reynolds v. Prudential Insurance Co. of America*, 181 Minn. 52, 55, 231 N.W. 615, 616 (Minn. 1930) (internal citations omitted); *see also Thane Lumber Co. v. J.L. Metz Furniture Co.,* 12 F.2d 701, 703 (8th Cir. 1926); *Robie v. Holdahl*, 180 Minn. 226, 230 N.W. 641, 643 (Minn. 1930).  The facts are disputed as to whether Larken, through Goldston and others, told Northwest representatives that Capp's signature would be needed, and whether Northwest said it was not necessary to get it.  Northwest denied these contentions, and they are disregarded for purposes of these motions.  However, it is not disputed that Northwest included in the HSAs a signature line for approval by the "owner," distinct from the signature line for the Hotel itself.  The owner's signature line was never removed, either before or after Northwest and Larken executed the documents, making it patent that Northwest did not assume during the negotiations that Larken had actual authority to bind the "owner."

Under these specific circumstances, Northwest cannot ask the Court to release it from the reasonable consequences of its actions.  "It is familiar law that a third person dealing with a known agent is charged with notice of his powers where it is claimed that the agent had actual authority to bind his principal. The general rule is that he cannot rely

16

on the assumption of authority, but must investigate and ascertain the nature and extent of the agent's powers." *Hill v. James*, 148 Minn. 261, 265 (Minn. 1921) (internal citations omitted). *Hill v. James* suggests that this duty of inquiry prevails even where the question is actual authority, at least where (as here) the issue of the agent's actual authority was raised and never effectively resolved.

In any event, there is no need to consider the issue of a duty of inquiry in order to grant summary judgment to Capp on the issue of actual authority. While existence of an agency relationship based upon the parties' conduct is a question of fact, *see generally A. Gay Jenson Farms, Co. v. Cargill*, 309 N.W.2d 285, 290 (Minn. 1981), Northwest relies exclusively on the Management Agreement to support its motion for summary judgment, and neither of the parties contends that the Agreement is ambiguous. (NWA S.J. Memo. p. 10.) Under these circumstances, interpretation of the agreement is a matter of law. *See generally Quinlivan v. EMCASCO Ins. Co.*, 414 N.W.2d 494, 498 (Minn. Ct. App. 1987). The Management Agreement is clear and unambiguous and did not give Larken authority to enter into the HSAs. For the reasons set forth above, Northwest's summary judgment motion, based on the principle of actual authority of Larken as agent, is denied. Capp is entitled to judgment on the issue of actual authority.[11]

---

[11] Northwest also contends in its reply brief that if Larken did not have authority to bind Capp through the term of the Management Agreement, the HSAs should be reformed and enforced to the extent of Larken's actual authority to bind Capp for a limited period. On this theory, Northwest would be entitled to damages through December 31, 2007 (the expiration date of the Management Agreement) rather than through August 20, 2009 (the expiration date of the HSAs). Northwest has not sought to reform the contract and its tardy reliance on yet another doctrine comes too late. In any event, the authority in support of this argument that Northwest cites is Restatement (Third) Agency § 6.05(1), which states

> If an agent makes a contract with a third party that differs from the contract that the agent had actual or apparent authority to make only in an amount or by the inclusion or exclusion of a separable part, the principal is subject to liability to the third party to the extent of the contract that the agent had actual or apparent authority to make if (a) the third party seasonably makes a manifestation to the principal of willingness to be bound; and (b) the principal has not changed

B.  Capp's Summary Judgment Motion

The remaining question is whether Northwest's other counterclaims can be

determined on this motion.

    i.  Tortious Interference with Contract

Capp seeks dismissal of Northwest's claim for tortious interference with contract,

based on the allegation that Capp instructed Larken to terminate the HSAs.  Under

Minnesota law, the elements of a tortious interference claim are "(1) the existence of a

contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional

procurement of its breach; (4) without justification; and (5) damages." *Furlev Sales &*

*Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 25

(Minn. 1982).  The burden of proving sufficient justification for interference falls on the

defendant, while the burden of proving the remaining elements lies with the plaintiff.  *Id.*

Capp argues first that Northwest has not offered adequate evidence that Capp

intentionally procured breach of the HSAs by instructing Larken to terminate them.  It

appears that Northwest bases its claim upon the following facts:  First, an email sent by

John Karver, an employee of CBRE, Capp's real estate broker, to La Quinta, the

prospective purchaser, sent on March 30, 2006, stated, "[w]e told Larken yesterday that

they needed to get rid of NW airlines."  (Eyres Decl., Exh. R.)  Northwest notes that

Larken also sent Capp a copy of a letter addressed to Northwest, dated March 31, 2006,

in which Larken cancelled the HSAs.  (Eyres Decl., Exh. T.)  Northwest alleges that

---

    position in reasonable reliance on the belief that no contract bound the principal
    and the third party.

It does not appear that reformation would be possible because Capp changed its position by
entering into an agreement to sell the property to La Quinta.  There is also no claim on
Northwest's part that it made a "seasonable" manifestation to Capp of its willingness to be bound
to the HSAs only to December 31, 2007; it appears that it first raised the issue at the hearing on
these motions.

another letter was sent by Capp's attorney to Larken on April 7, 2006, stating "that it was Larken's 'responsibility' to terminate all contracts, including the HSAs, that La Quinta was not willing to assume." (NWA S.J. Memo., p. 8; SMF 32; Eyres Decl., Exh. U.)

Capp counters by arguing that Karver testified at deposition that his email of March 30, 2006 was a misstatement, that he was never told to "get rid of Northwest" by Capp or Larken and that he had no knowledge of or involvement in how the HSAs were terminated. (Capp S.J. Memo., p. 50.) Capp further asserts that Larry Cahill, the President and 50% owner of Larken, testified that he chose to terminate the HSAs, that Larken drafted the letter sent to Northwest and that to the extent the letter was shown to Capp, it was merely for informational purposes. The conflicting evidence provided by the parties suggests that there is a genuine issue of material fact as to whether Capp had a hand in Larken's termination of the contract.

However, Capp is on stronger ground in its argument that Northwest cannot maintain its case for tortious interference because it cannot prove the necessary element of lack of justification. "Ordinarily, whether interference is justified is an issue of fact, and the test is what is reasonable conduct under the circumstances." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994). As noted above, the burden of proving justification is on the defendant. However, "[t]here is no wrongful interference with a contract where one asserts 'in good faith a legally protected interest of his own * * * believing that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.'" *Kjesbo v. Ricks*, 517 N.W.2d at 588, quoting Restatement (Second) of Torts § 773 (1979). Furthermore,

> An action for interference with contract does not lie where the alleged interferer has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected and employs no improper means. . . For purposes of this tort, improper means are those that are independently

wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law. Moreover, the improper means must be a part of what procures the breach . . . [W]hen a defendant has a legitimate economic interest to protect, a plaintiff must show that the breach of plaintiff's contract with the third party resulted at least in part from the defendant's commission of an independent tort or other illegality.

*Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241-242 (Minn. Ct. App. 2000) (internal citations omitted.).

There is no issue on the admitted facts that Capp had a legitimate economic interest in taking the actions that Northwest complains of.  Indeed, as discussed below, Northwest argues that Capp ratified the HSAs because it waited too long after learning of the HSAs before it disavowed them.  Capp was attempting to sell the Hotel, and the existence of the HSA had a potentially significant impact on that sale.  Whether the termination was directed by Larken in conjunction with Capp, or by Larken alone, it is clear that Capp had an interest in the outcome.  Indeed, the interest of a hotel owner in a possible sale of the hotel and termination of Northwest's rights is provided for in the HSA template, which purports to require an owner to provide Northwest with notice of any proposed sale.

Several cases cited by Capp are illustrative.  In *Aslakson v. Home Sav. Assoc.*, 416 N.W.2d 786 (Minn. Ct. App. 1987), plaintiffs entered into a conditional sales contract to purchase a mobile home.  Thereafter, they entered into an agreement to sell it.  They knew that any prospective buyer would have to undergo a credit check, and their agreement with the prospective purchaser contained the following language:  "This offer is contingent upon buyer being able to assume the loan."  The defendants did not consent to the transfers due to the credit histories of each of the prospective buyers, and plaintiffs alleged interference with their contracts.  The Court held that contracts had not existed

due to the conditional promise, but that even if valid contracts had existed, "liability for wrongful interference may be avoided by showing that the [respondent] was justified by a lawful object which he had a right to assert." *Id.* at 790, quoting *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 532, 134 N.W.2d 892, 897 (1965). The Court noted that "[w]hen one acts in pursuance of a superior or equal right, that person is legally justified in his action." *Id.* at 790. *See also Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 559 (Minn. Ct. App. 2001), where the Court stated:

> there is no wrongful interference with a contract where one asserts in good faith a legally protected interest of his own * * * believing that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction . . . .

Since Capp had a legitimate interest in the rooms being vacant, which in turn served its legitimate economic interest in the sale of the property, the only real question is whether the interference alleged to have occurred was the result of "defendant's commission of an independent tort or other illegality." *Harman*, 614 N.W.2d at 241-242. Northwest fails to argue that it was. Capp is entitled to summary judgment on the issue of tortious interference with contract.

ii. <u>Breach of Contract (Apparent Authority)</u>

While Northwest abandoned its argument based on apparent authority as part of its own motion for summary judgment, the issue whether Larken had apparent authority to act as Capp's agent must be addressed with respect to Capp's motion for summary judgment on its behalf rejecting Northwest's claim that it breached a contract that Larken had apparent authority to sign.

Under Minnesota law, "[a]pparent authority is that authority which a principal holds an agent out as possessing, or knowingly permits an agent to assume." *Foley v. Allard*, 427 N.W.2d 647, 652 (Minn. 1988), citing 1A Dunnell Minn. Digest 2d Agency §

2.02 (3d ed. 1982).  It is based on the principal's conduct and not that of the agent.  *Id.*

"The principal must have held the agent out as having authority, or must have knowingly

permitted the agent to act on its behalf; furthermore, the party dealing with the agent must

have actual knowledge that the agent was held out by the principal as having such

authority or had been permitted by the principal to act on its behalf; and the proof of the

agent's authority must be found in the conduct of the principal, not the agent."  *Id.*, citing

*Hockemeyer v. Pooler*, 268 Minn. 551, 562, 130 N.W.2d 367, 375 (1964).

> An agent's apparent authority results from statements, conduct, lack of
> ordinary care, or other manifestations of the principal's consent, whereby
> third persons are justified in believing that the agent is acting within his
> authority. Therefore, the scope of apparent authority is determined not
> only by what the principal knows and acquiesces in, but also by what the
> principal should, in the exercise of ordinary care and prudence, know his
> agent is doing.  Thus, if a principal acts or conducts his business, either
> intentionally or through negligence, or fails to disapprove of the agent's
> acts or course of action so as to lead the public to believe that his agent
> possesses authority to act or contract in the name of the principal, the
> principal is bound by the acts of the agent within the scope of his apparent
> authority as to persons who have *reasonable grounds* to believe that the
> agent has such authority and in good faith deal with him.

*McGee v. Breezy Point Estates*, 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969), citing 3

Am. Jur. (2d) Agency, § 74 (emphasis added).

Under Minnesota law, "[w]hether an agent was clothed with apparent authority to

act as he did is a question for the trier of fact."  *Hagedorn v. Aid Asso. for Lutherans*, 297

Minn. 253, 257, 211 N.W. 2d 154, 157 (1973).  Nevertheless, on these cross-motions for

summary judgment, which were made after extensive document and deposition

discovery, Northwest had an obligation to marshal the facts in its favor on the issue of

apparent authority.  All Northwest contends is that Capp hired Larken to manage and

operate the Hotel as its general manager, that Larken was authorized to rent rooms to the

public, and that the HSAs were executed by a Larken employee as the "director of

operations" for the Hotel.  Northwest contends it was therefore justified in assuming that

Larken had authority to negotiate the HSAs and bind Capp to them.

 None of these facts demonstrates that Capp gave Larken apparent authority to

enter into the HSAs.  As Capp argues, the decisive fact is the absence of its signature as

"owner" on the HSAs, where Northwest's own template left a space for the owner to

sign.  Several Minnesota cases are instructive.  *Clinton Film Serv. Co. v. Conan*, 140

Minn. 94, 167 N.W. 289 (Minn. 1918), involved a dispute between tenants, the plaintiffs,

and a lessor and building owner, the defendant, with respect to certain lease terms.  The

parties attempted to settle their disputes relating to the lease through a written agreement.

"The agreement was signed by the occupants under the lease; but the owners, before

signing, struck out this provision upon which the importance of this lawsuit to the lessee

hinges..."  Id. at 289.  The Supreme Court of Minnesota stated:

> When the document thus completed, by the signatures of all the parties
> thereto, was tendered to plaintiffs, they refused to accept it. The contention
> is that the signatures of the lessors were not contemplated, the instrument
> becoming effective as a contract as soon as signed by plaintiffs only. We
> think neither the circumstances, nor the language of the letters bear out the
> contention. Exhibit D on its face requires the signatures of all the parties
> named and to be bound. Plaintiffs must so have understood when they
> signed, for they left the two upper lines of the spaces for signatures and
> witnesses blank in each triplicate, the evident purpose being that the
> lessors, the parties of the first part to the agreement, and their witnesses,
> should there sign. We do not think that the letters can reasonably be
> construed as meaning plaintiffs alone when using the word "parties," but
> that "parties" refers to every one named in the instrument.

*Id.* at 291.  In *Upton Mill & Elevator Co. v. Baldwin Flour Mills*, 147 Minn. 205, 179

N.W. 904 (Minn. 1920), a case involving the statute of frauds, the Supreme Court of

Minnesota stated, "We think it is perfectly plain that by printing 'Baldwin Flour Mills,

By _____' on the forms; the signature of defendant or his authorized agent upon the

blank line was necessary to complete the memorandum."  *Id.* at 906.

23

In *Kenneally v. First Nat'l Bank of Anoka*, 400 F.2d 838 (8th Cir. 1968), which involved Minnesota law, a debtor had executed an assignment of accounts receivable in connection with the negotiation of a bank loan. Under the debtor's corporate resolutions, the secretary of the corporation was required to jointly execute agreements to borrow money or give security, and the bank was aware of the resolution. The secretary had not signed the note or the assignment. Additional monies were extended and the secretary did sign a second note, but an assignment of inventory and a factor's lien were again executed without the signature of the secretary. The debtor subsequently filed a bankruptcy petition, and the trustee objected to the bank's claim as a secured creditor. The Circuit Court held that the security instruments were not valid, the president was without express or implied authority to bind the corporation through his signature, as express authority was negated by the resolution and apparent authority was lacking because "only those who have acted in reliance upon the apparent authority of the agent are entitled to recover where the agent possessed no actual authority, express or implied". *Id.* at 842.

Northwest cannot prevail on the issue of apparent authority because the reliance factor requires that any belief in the apparent authority of the agent to act on behalf of the principal must be reasonable. *See McGee*, 283 Minn. at 22, 166 N.W.2d at 89. "Minnesota law has always placed the burden of reasonableness, and diligence, upon any person dealing with an agent to examine whether that agent has the authority to complete the proposed act." *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1152-53 (D. Minn. 2003) (citations omitted) (Minnesota law); *see also Truck Crane Serv. Co. v. Barr-Nelson, Inc.*, 329 N.W.2d 824, 827 (Minn. 1983) ("[O]ne who deals with an agent is put to a certain burden of reasonableness and diligence."). A title is not enough to

establish that a party had apparent authority to enter into a contract. *See Thompson v. North Star Muskrat Farm, Inc.*, 183 Minn. 314, 315-16, 236 N.W. 461, 462 (Minn. 1931). As noted above, Larken did not make any representation in the HSAs as to its authority to bind Capp. There is no contention that Larken undertook the obligation to obtain Capp's signature or misled Northwest as to the extent of its authority. Having left a signature line for the owner, and having an obvious desire to bind the owner to the contract, it was unreasonable for Northwest to rely on Larken's apparent authority to bind the absent party. Stated differently, Northwest took the risk that there was no actual authority and the owner would not be bound.

Certainly, there was in the least a duty of inquiry raised on the part of Northwest with respect to Larken's authority. "Every person who undertakes to deal with an agent is put on inquiry and must discover whether the agent has the authority to complete the proposed act." *West Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 896 (Minn. 1981), citing *Mooney v. Jones*, 238 Minn. 1, 54 N.W.2d 763 (1952); *see also Truck Crane Serv. Co.*, 329 N.W.2d at 826-27; *Barton-Parker Mfg. Co. v. Wilson*, 96 Minn. 334, 335, 104 N.W. 968, 968-69 (1905). Northwest proceeded in the absence of Capp's express consent and cannot recover on the theory of apparent authority.

<u>Ratification</u>

In its response to Capp's motion for summary judgment, Northwest briefly adverts to the doctrine of ratification, asserting that even if Larken did not bind Capp to the HSAs, Capp ratified the agreements and is therefore bound. Under Minnesota law, "[r]atification occurs when one, having full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another, thereby creating an agency relationship and binding the principal by the act of

his agent as though that act had been done with prior authority." *Anderson v. First Nat'l Bank of Pine City*, 303 Minn. 408, 410, 228 N.W.2d 257, 259 (Minn. 1975).  Northwest asserts that Capp ratified the HSAs by (i) its retention of benefits under the HSAs, and (ii) its failure to seasonably inform Northwest of its disavowal of the HSAs.  *See Strader v. Haley*, 216 Minn. 315, 328, 12 N.W. 2d 608, 614 (Minn. 1943) ("Where a principal accepts and retains the benefits of an unauthorized act of an agent with full knowledge of all the facts, he thereby ratifies the act.")

As to the issue of retention of benefits, it is speculative to assert that Capp benefited from the HSAs after it learned of them.  This argument makes little sense in light of Northwest's further contention that La Quinta insisted that Larken "get rid" of Northwest.[12]  As to the second issue, the facts are disputed.  Northwest states that neither Capp nor Larken timely informed Northwest that Capp objected to the HSAs and cites the principle that acquiescence can be found through silence.  *See Conolly v. Foster*, 186 Minn. 8, 13 , 242 N.W. 334, 336 (Minn. 1932).  Although Capp asserts that it repudiated the HSAs to Larken soon after it learned of their terms, it is not asserted that Capp informed Northwest or that either Capp or Larken acted immediately.  Northwest has offered no authority that under Minnesota law the principal must deal directly with the third party with which an alleged agent has contracted, but the facts are disputed as to the time and timeliness of any disavowal of the HSAs.[13]

---

[12] It also bears noting that Northwest was not obligated by the HSAs to rent all of the rooms that were reserved for it under the HSAs.  The HSAs state, "Hotel agrees to provide one hundred fifty (150) rooms per night during the term of the Agreement.  Nothing in this Agreement shall be considered to be a guarantee by Northwest to purchase a minimum number of rooms from the Hotel."  (HSAs ¶ 3.)  Even if Northwest notified the Hotel of the need for a room, Northwest was able to cancel at no charge all or part such accommodation up to 6:00 p.m. on the date of the reservation.  (HSAs ¶ 3(a)).

[13] Of course, to the extent the HSAs were beneficial to Northwest, any delay in their disavowal only benefited Northwest.

In any event, Northwest's ratification argument fails on the basis of the Minnesota statute of frauds.  In *Gresser v. Hotzler*, 604 N.W.2d 379 (Minn. Ct. App. 2000), the Minnesota Court held that "ratification 'must be by an act of the character required for the original authority.'  When the original authorization must be in writing, the ratification must be in writing as well.  Because the statute of frauds requires written authorization for an agent to enter into a purchase agreement, [appellant] cannot claim ratification through conduct or oral statements."  *Id.* at 385-86, citing *Judd v. Arnold*, 31 Minn. 430, 432, 18 N.W. 151, 151 (Minn. 1884); Minn. Stat. § 513.05.

As mentioned above, in this case, the original authority (the HSAs) were intended by the parties to "run with the land" and thus to be an "interest in lands."  (HSAs ¶ 12.) Minn. Stat. § 513.05 provides:

> Every contract for the leasing for a longer period than one year or for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party by whom the lease or sale is to be made, *or by the party's lawful agent thereunto authorized in writing*; and no such contract, when made by an agent, shall be entitled to record unless the authority of such agent be also recorded. (emphasis added.)

"[A]greements to create an interest in land are void unless the terms are memorialized in writing . . ."  *See AG Services of America, Inc. v. Schroeder*, 693 N.W.2d 227, 236 (Minn. Ct. App. 2005), citing Minn. Stat. § 513.05 and holding that claim for breach of contract extending statutory redemption period failed because extension of redemption period involved an interest in land and must be in writing.  Under Minn. Stat. § 513.05, Capp's authorization or consent to Larken's acting as its agent in connection with the HSAs needed to be in writing, in order to bind Capp to the HSAs.

Northwest argues that the statute of frauds was satisfied because the Management Agreement was in writing and signed by both Capp and Larken.  (NWA Reply, p. 17.)

However, as discussed above, the Management Agreement did not give Larken actual authority to execute the HSAs.  Northwest relies on conduct for its ratification argument, but this is not enough.  As the Minnesota Court said in *Gresser*, "when the original authorization must be in writing, the ratification must be in writing as well" and a party "cannot claim ratification through conduct or oral statements."  *Gressler*, 604 N.W.2d at 385-86.  Since Capp's alleged ratification of the contractual obligation was not in writing, Northwest's ratification argument fails as a matter of law.

## III.  CONCLUSION

For the reasons set forth above, the summary judgment motion of Northwest is denied.  Capp's motion for summary judgment is granted to the extent requested, dismissing Northwest's claims of breach of contract, tortious interference with contract and ratification.  Capp is directed to settle an appropriate order on five days' notice.


Dated: New York, New York
      March 11, 2008

                            */s/ Allan L. Gropper*                 
                            UNITED STATES BANKRUPTCY JUDGE